**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

MUSTAFAH MUHAMMAD,

           Defendant.

Crim. Action No. 12-0253-3 (EGS)

<u>**MEMORANDUM OPINION AND ORDER**</u>

      Defendant Mustafah Muhammad ("Mr. Muhammad") is currently serving a 130-month sentence, followed by five years of supervised release, for Conspiracy to Distribute and Possess With Intent to Distribute 250 Grams or More of Cocaine Base, 100 Grams or More of Heroin, and Marijuana, in violation of 21 U.S.C. § 846, 841(a)(1), 841(b)(1)(A)(iii), 841(b)(1)(B)(i), and 841(b)(1)(D). *See* J. in *United States v. Muhammad*, CR 12-254, ECF No. 307 at 1-8.[1] [2] Mr. Muhammad has served approximately 92 months of his 130-month sentence, *see* Summ. Reentry Plan Progress Report, ECF No. 180-2 at 2; and, "accounting for good

_____

[1] Mr. Muhammad was a defendant in both *United States v. Kelly*, CR 12-253, and *United States v. Muhammad*, CR 12-254. These cases are related but were never consolidated. Mr. Muhammad filed the instant motion in the former case, but he was sentenced pursuant to a final judgment in the latter case. As a result, the Court cites to record items in both cases as appropriate throughout this Opinion.
[2] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

time credits," he has a "projected release date of May 12, 2023," *see* Gov't's Opp'n Def.'s Emergency Mot. Compassionate Release ("Gov't's Opp'n"), ECF No. 182 at 4. Mr. Muhammad is incarcerated at FCI Oxford in Wisconsin. *See* Def.'s Emergency Mot. Compassionate Release ("Def.'s Mot."), ECF No. 180 at 3. Pending before the Court is Mr. Muhammad's Emergency Motion for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i). *See* Def.'s Mot., ECF No. 180.

Upon careful consideration of the motion, opposition, and reply thereto, the applicable law, and the entire record herein, Mr. Muhammad's motion is **GRANTED**.

## I. Background

On November 27, 2012, a federal grand jury indicted Mr. Muhammad and fourteen codefendants for offenses arising from their involvement in a conspiracy to distribute and possess with the intent to distribute cocaine base, heroin and marijuana. Indictment in *United States v. Muhammad*, CR 12-254, ECF No. 1. In the twenty-count indictment, Mr. Muhammad was charged with fifteen counts of various drug-related offenses. *Id*. On April 16, 2014, Mr. Muhammad entered a guilty plea to a superseding information charging him with one count of conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base, 100 grams or more of heroin, and marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(iii),

2

841(b)(1)(B)(i), and 841(b)(1)(D). Plea Agreement in *United States v. Muhammad*, CR 12-254, ECF No. 243 at 1. On July 22, 2015, Mr. Muhammad was sentenced to 130 months of incarceration and five years of supervised released, the remaining counts in the indictment were dismissed, and the related criminal case in which this pending motion arises was dismissed. Minute Order in *United States v. Muhammad*, CR 12-254, dated July 22, 2015.

## II. Legal Standard

The First Step Act of 2018 ("First Step Act"), Pub. L. 115-391, § 603, 132 Stat. 5194, 5238-5240 (2018), amended 18 U.S.C. § 3582(c)(1)(A) to provide the Court with the authority to modify the sentence of a defendant after its imposition upon a motion by the defendant. Prior to the First Step Act, only the Director of the Bureau of Prisons could bring such a motion. *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) ("Increasing the Use and Transparency of Compassionate Release").

To be considered for a sentence modification under the First Step Act, the defendant first must have either fully exhausted all administrative rights to appeal the BOP's failure to bring a motion for release on his behalf or allowed a lapse of 30 days from the time the BOP received his request, whichever is earlier. *See* 18 U.S.C. § 3582(c)(1)(A). After receiving a properly filed motion, the Court must then determine whether there are "extraordinary and compelling reasons [that] warrant

3

. . . a reduction" in sentence and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* In relevant part, the Sentencing Commission's policy statement provides that a court may reduce a defendant's term of imprisonment if the court determines that there are "extraordinary and compelling reasons" that warrant a reduction, the "defendant is not a danger to the safety of any other person or to the community," and the reduction is consistent with the policy statement. *See* U.S.S.G. § 1B1.13(1)-(3). Finally, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A).

## III. Analysis

### A. Mr. Muhammad Exhausted his Administration Remedies

The parties agree that Mr. Muhammad has exhausted his administrative remedies. *See* Def.'s Mot., ECF No. 180 at 14-15; Gov't's Opp'n, ECF No. 182 at 5. In addition, "the compassionate release statute's 'exhaustion' requirement is neither jurisdictional nor a mandatory claims processing rule and may be waived when exhaustion 'would be futile.'" *United States v. Bikundi*, No. CR 14-30-1 (BAH), 2020 WL 5518465, at *4 (D.D.C. Sept. 14, 2020). Mr. Muhammad filed a request for compassionate release with the warden of FCI Oxford on April 15, 2020, and the warden denied the request on April 17, 2020. *See* Def.'s Mot., ECF No. 180 at 3-4; Gov't's Opp'n, ECF No. 182 at 4-5. Mr.

4

Muhammad filed a request for reconsideration on July 26, 2020, but he never received a response. *See* Def.'s Mot., ECF No. 180 at 4; Gov't's Opp'n, ECF No. 182 at 5. Accordingly, the Court finds that Mr. Muhammad has met his exhaustion requirement. *See* 18 U.S.C. § 3582(c)(1)(A).

### B. Mr. Muhammad Has Provided Sufficient Extraordinary And Compelling Reasons For Compassionate Release

The Court now turns to whether Mr. Muhammad has established "extraordinary and compelling reasons" warranting the reduction of his sentence. *See United States v. Morris*, No. CR 12-154 (BAH), 2020 WL 2735651, at *2 (D.D.C. May 24, 2020) (citing § 3582(c)(1)(A)(i)). The commentary to the Sentencing Commission's policy statement, which was published before Congress passed the First Step Act and before the COVID-19 pandemic, provides guidance on what circumstances would amount to "extraordinary and compelling reasons." *See* U.S.S.G. § 1B1.13. Those reasons include, as most relevant here, that the "defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," *id.* at cmt. n.1(A)(ii), or "[o]ther [r]easons . . . [a]s determined by the Director of the Bureau of Prisons" presenting "an extraordinary and compelling reason other than, or in

combination with, the reasons described" in the policy statement, *id.* at cmt. n.1(D).

As a threshold matter, Mr. Muhammad and the government dispute whether the Court's consideration of what constitutes an extraordinary and compelling reason is limited to the specific circumstances described in the Sentencing Commission's policy statement and commentary. Mr. Muhammad argues that "compassionate release is not limited . . . to only those 'extraordinary and compelling reasons' listed in the Guideline or other reasons identified by the BOP; courts can independently determine those reasons." Def.'s Mot., ECF No. 180 at 13 (citing *United States v. Young*, 458 F. Supp. 3d 838 (M.D. Tenn. Mar. 4, 2020)). Although 18 U.S.C. § 3582(c)(1)(A) provides in relevant part that a court may reduce a defendant's term of imprisonment only if "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," Mr. Muhammad argues that the Sentencing Commission's policy statement is "outdated," and the Court need not strictly adhere to it. *See id.* at 11. Mr. Muhammad directs the Court to recent decisions from other circuits that have reached this result. *See* Def.'s Reply, ECF No. 184 at 3-4 (citing *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020)).

6

The courts in those circuits reason that because the policy
statement predates the First Step Act, it does not account for
motions brought directly by defendants (like this one), so there
is in fact "no Sentencing Commission policy statement
'applicable' to" such motions. *See, e.g.*, *McCoy*, 981 F.3d at
283. As a result, "district courts are 'empowered . . . to
consider *any* extraordinary and compelling reason for release
that a defendant might raise.'" Def.'s Reply, ECF No. 184 at 3
(citing *McCoy*, 981 F.3d at 284). The government, conversely,
contends that "[i]f a defendant does not have any health
conditions that fall within one of the categories specified in
the application note, and no other part of the application note
applies, the defendant's motion for compassionate release must
be denied." Gov't's Opp'n, ECF No. 182 at 12. The government
acknowledges that the Sentencing Commission's policy statement
has not been amended since Congress passed the First Step Act,
but it argues that "[i]n light of the statutory command that any
sentence reduction be 'consistent with applicable policy
statements issued by the Sentencing Commission,' 18 U.S.C. §
3582(c)(1)(A)(ii), and the lack of any plausible reason to treat
motions filed by defendants differently from motions filed by
the BOP, the policy statement applies to motions filed by
defendants as well." *Id.* at 10 n.3. The Court of Appeals for the
District of Columbia Circuit has not yet addressed this issue,

and this Court need not decide the issue because even if courts
may only consider the specific circumstances set out in the
policy statement, Mr. Muhammad has established "extraordinary
and compelling" reasons for release.

Mr. Muhammad argues that "the mental and physical stress of
being detained under the conditions of confinement at FCI
Oxford" during the COVID-19 pandemic, combined with his
preexisting medical conditions, "substantially diminishes his
ability to provide the type of self-care within the prison
environment that is needed now more than ever and constitutes
extraordinary and compelling circumstances warranting his
immediate release from imprisonment." Def.'s Mot., ECF No. 180
at 14 (citing *United States v. Johnson*, 464 F. Supp. 3d 22, 38-
39 (D.D.C. 2020)) (internal quotations omitted). Mr. Muhammad
contends that FCI Oxford "has been particularly hard hit" by
COVID-19: as of November 9, 2020, 592 of 848 inmates had tested
positive for the virus and recovered ("the eighth highest number
among the BOP's 122 prisons"); 44 staff had tested positive and
recovered; and nine inmates and nine staff members were testing
positive at that time. *Id.* at 8-9 (citing
www.bop.gov/coronavirus (checked November 8, 2020)). Mr.
Muhammad argues that he has the following medical conditions
that put him at serious risk of severe illness from COVID-19:
(1) obesity (Mr. Muhammad states that he is 6'4" tall and

weighed 264.4 pounds on May 26, 2020, making his body mass index ("BMI") 32.1), *see id.* at 16; (2) asthma (Mr. Muhammad states that he has an Albuterol Inhaler for his asthma that he has been instructed to use on an as-needed basis, and he was seen by FCI Oxford medical staff for shortness of breath in June 2020), *see id.* at 18; (3) former marijuana smoker (Mr. Muhammad states that he "smoked daily"), *see id.* at 19; and (4) member of race and gender that are disproportionately infected and killed by COVID-19 (Mr. Muhammad is a Black male), *see id.* at 19-20.

The government acknowledges that "if an inmate has a chronic medical condition (*i.e.*, one 'from which [the inmate] is not expected to recover') that the CDC has identified as elevating the risk of becoming seriously ill from COVID-19, that may qualify as a 'serious' condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." Gov't's Opp'n, ECF No. 182 at 12 (citing U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I)). The government also acknowledges that Mr. Muhammad has asserted that he suffers from at least two conditions—asthma and obesity—"which are, in certain circumstances, among the CDC's list of risk factors for severe illness from COVID-19." *See id.* at 12. The government asserts, however, that Mr. Muhammad "does not provide any evidence to suggest that his specific conditions place him at risk of severe

illness from COVID-19." *Id.* The government contends that Mr.
Muhammad's asthma and obesity do not place him at risk of severe
illness from COVID-19 because: (1) his asthma is "well-
controlled," he has been prescribed an Albuterol inhaler to use
on an as-needed basis, he told FCI Oxford medical staff that he
has not had an asthma attack since age 16, he "was not coughing,
wheezing, or congested, and did not appear to be in any
distress," at his June 5, 2020 visit with FCI Oxford medical
staff, and he "does not actually even claim that his asthma
rises to the level of 'moderate to severe asthma,'" *see id.* at
13; and (2) "nothing in [Mr. Muhammad's] medical records suggest
that [he] has been deemed obese," *see id* at 14. The government
further asserts that Mr. Muhammad previously contracted COVID-19
and recovered from it. *Id.* According to the government, there is
"no indication that [Mr. Muhammad] suffered from any serious
medical complications due to COVID-19 despite the medical
conditions discussed in his motion." *Id.*

In his Reply, Mr. Muhammad counters that: (1) his asthma is
"serious enough that BOP has prescribed an inhaler for him to
use," and "BOP's records show that he had difficulty breathing
and was short of breath," Def.'s Reply, ECF No. 184 at 13; (2)
his height and weight place him in the "obese" category
according to the CDC, and it is not necessary for Mr. Muhammad
to prove he has been "diagnosed with obesity," *see id.*; and (3)

"the fact that Mr. Muhammad recently had COVID does not mean that he is still not in grave danger," *see id.* at 5. Mr. Muhammad also argues that the government has ignored that he is a former smoker, which he contends increases his risk of severe illness from COVID-19, and that the government has ignored his race and gender in its analysis. *See id.* at 13-14.

The Court agrees with the government that Mr. Muhammad has not demonstrated that his asthma is moderate-to-severe, and if Mr. Muhammad's asthma alone served as the basis for this motion, he would not meet his burden of showing extraordinary and compelling reasons exist for release. *See United States v. Allen*, No. 15-cr-107 (CKK), ECF No. 33 at 9-10 (D.D.C. July 20, 2020) (finding that a defendant who claimed to have asthma and chronic bronchitis did not establish extraordinary and compelling reasons for release where medical examinations revealed that the defendant's "Respiratory Function, Cardiovascular Function, and Lungs" were normal); *see also United States v. Ramos*, 14 Cr. 484 (LGS), 2020 WL 1685812, at *2 (S.D.N.Y. Apr. 7, 2020) (denying release where "Defendant's medical records show no new asthma attacks, and that his asthma is being treated by the BOP"). Similarly, the Court is not persuaded that Mr. Muhammad's race and gender alone would rise to the level of requiring immediate release. *See United States v. Brown*, No. CR 13-30 (ESH), ECF No. 58 at 5 (D.D.C. July 29,

2020) (denying the release of an inmate who argued his age, race, alcohol addiction, and untreated mental health conditions made him particularly vulnerable to COVID-19).

Considering his medical conditions as a whole, however, the Court is persuaded that Mr. Muhammad has met his burden of proving extraordinary and compelling reasons exist warranting release. Under the CDC's guidance, Mr. Muhammad's BMI of 32.1 and his history of smoking place him at an increased risk of severe COVID-19 complications. *People with Certain Medical Conditions*, CDC (last visited Feb. 15, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html ("Adults of any age with the following conditions are at increased risk of severe illness from COVID-19: . . . Obesity (body mass index [BMI] of 30 kg/m$^2$ or higher but < 40 kg/m$^2$) . . . Smoking."). The CDC and other health experts consider obesity a significant factor in whether a person will experience severe symptoms from COVID-19. *See United States v. Warren*, No. CR 10-202 (EGS), ECF No. 66 at 12 (D.D.C. July 30, 2020) (noting the "multitude of studies linking obesity to severe COVID-19 symptoms" and concluding that even a person with a BMI below but within close proximity to the CDC's guidelines remains at serious risk of severe symptoms, "especially when considered in the context of other established conditions such as . . . a history of

12

smoking"); *United States v. Delgado*, 457 F. Supp. 3d 85, 89 (D.
Conn. 2020) (citing a study "by doctors at NYU Langone Health
Center in New York City" finding that a BMI of 30 or higher "was
the single biggest [chronic] factor, after age, in whether those
with COVID-19 had to be admitted to a hospital" (citation
omitted)). Contrary to the government's suggestion, there is no
reason for the Court to require Mr. Muhammad to prove that he
has been "deemed obese"; height and weight are enough to
calculate Mr. Muhammad's BMI. *Cf. United States v. Jansen*, No.
08-cr-00132-SEB, 2020 WL 6946504, at *5 (S.D. Ind. Nov. 25,
2020) ("CDC has determined that obese adults, regardless of
their age, are at higher risk of experiencing severe symptoms
should they contract COVID-19. And the CDC guidelines do not
specify that obese individuals who are not on medication are at
a lower risk for severe complications."). The Court is therefore
satisfied that Mr. Muhammad's obesity and history of smoking,
considered in conjunction with his current state of
incarceration, constitute extraordinary and compelling reasons
for release. *See, e.g.*, *United States v. Boykin*, No. CR 14-201
(EGS) and No. CR 15-164 (EGS), 2020 WL 6193838, at *3 (D.D.C.
July 16, 2020) (holding that defendant's severe obesity provided

a sufficient "extraordinary and compelling reason" that would warrant a reduction in sentence).

The Court is unpersuaded by the government's suggestion that Mr. Muhammad's past COVID-19 diagnosis precludes him from obtaining the relief he now seeks. *See* Gov't's Opp'n, ECF No. 182 at 14. District courts across the country have reached different results when evaluating whether a prior COVID-19 diagnosis weighs in favor of or against finding extraordinary and compelling reasons support a defendant's compassionate release. *Compare United States v. Risley*, No. 1:12-CR-0363 AWI, 2020 WL 4748513, at *6 (E.D. Cal. Aug. 17, 2020) (denying motion for compassionate release where defendant had already had COVID-19 and recovered without ever having serious symptoms or complications from the infection, noting that "courts generally find that the risk of a second infection does not constitute sufficiently compelling grounds to justify compassionate release"), *United States v. Zahn*, No. 4:18-cr-00150-JD-1, 2020 WL 3035795, at *2 (N.D. Cal. June 6, 2020) ("[T]he immediate threat to Zahn has passed, fortunately with no serious complications of any kind. That is enough to find that he has not proffered an extraordinary and compelling reason for release."), *and United States v. Lampkin*, No. 17-cr-399-MJW, 2020 WL 4016115, at *2 (D. Colo. July 16, 2020) (denying release in part because "Lampkin appears to have 'weather[ed] the storm'

14

already"), *with United States v. Babbitt*, Cr. No. 18-384, 2020
WL 6153608, at *8 (E.D. Pa. Oct. 21, 2020) (granting
compassionate release because "[a]lthough it appears that
Babbitt has recovered, he is still at risk for re-infection"),
*United States v. Easton*, No. 18-CR-22 RLW, ECF No. 71 at 5 (E.D.
Mo. Nov. 17, 2020) ("The fact that Easton has already contracted
COVID-19 does not mean he is no longer at risk, but it does show
that BOP cannot protect him from the virus."), *and United States
v. King*, CR No. 18-318 (JDB), ECF No. 38 at 2-3 (D.D.C. July 6,
2020) (concluding that extraordinary and compelling reasons for
release existed even where defendant previously had COVID-19 and
was generally asymptomatic, noting that "[t]he court . . .
cannot dismiss the risk of re-infection").

Courts have observed that the scientific community remains
uncertain as to the risks of COVID-19 reinfection and the
duration of immunity after a positive COVID-19 diagnosis. *See,
e.g.*, *Risley*, 2020 WL 4748513, at *6 ("According to the CDC,
'[r]einfection with SARS-CoV-2 has not yet been definitively
confirmed in any recovered persons to date. If, and if so when,
persons can be reinfected with SARS-CoV-2 remains unknown and is
a subject of investigation."); *King*, No. 18-318 (JDB), ECF No.
38 at 2 ("[A]uthorities like the Center for Disease Control and
Prevention and the World Health Organization do not yet know

whether antibodies in those who have recovered from COVID-19 ensure immunity.").

While the decisions cited by the government generally conclude that "the possibility of reinfection from COVID-19 is too speculative to warrant compassionate release," *see Risley*, 2020 WL 4748513, at *7, the Court is not persuaded. In October of 2020, the CDC noted that "SARS-CoV-2 reinfection is a rapidly evolving area of research," and "CDC is aware of recent reports of suspected cases of SARS-CoV-2 reinfection among persons who were previously diagnosed with COVID-19." *Criteria for Investigating Suspected SARS-CoV-2 Reinfection*, CDC (last visited Feb. 15, 2021), https://www.cdc.gov/coronavirus/2019-ncov/php/invest-criteria.html. The World Health Organization reported in late December of 2020 that "there are some reports of individuals who have been reinfected with SARS-CoV-2," and there are "likely to be more examples of reinfection reported and scientists are working to understand the role of the immune response in the first and second infection." *Coronavirus Disease (COVID-19): Serology, Antibodies, and Immunity*, World Health Organization (last visited Feb. 15, 2021), https://www.who.int/news-room/q-a-detail/coronavirus-disease-covid-19-serology. More recently, national news outlets have reported on studies from South Africa, Brazil, and the United States that suggest reinfection rates may be higher than

previously known, and past COVID-19 infections may not protect against newer and more contagious variants of the virus. *See* Marilynn Marchione, *New Variants Raise Worry About COVID-19 Virus Reinfections*, AP News (Feb. 8, 2021), https://apnews.com/article/coronavirus-new-variants-b4d472f3d61c62a57aa68c4aa7c85012. The Court agrees with Judge John D. Bates, a fellow jurist in this district, that the Court "cannot dismiss the risk of re-infection when authorities like the Center for Disease Control and Prevention and the World Health Organization do not yet know whether antibodies in those who have recovered from COVID-19 ensure immunity." *King*, No. CR 18-318 (JDB), ECF No. 38 at 2; *see also United States v. Yellin*, No. 3:15-CR-3181-BTM-1, 2020 WL 3488738, at *3 (S.D. Cal. June 26, 2020) ("Without scientific conclusions as to whether reinfection is possible or how long COVID-19 immunity lasts, the Court must err on the side of caution to avoid potentially lethal consequences.").

Although Mr. Muhammad recovered from his first COVID-19 infection without serious symptoms or complications, the Court cannot say that he is not at risk for reinfection, or that if he were re-infected, his symptoms would not be severe. *See* Decl. of Dr. Tara Vijayan, ECF No. 184-2 at 3 ("Re-infection with SARS-CoV-2 has been documented, with some individuals presenting with more severe disease than the first infection."); *see also*

17

*Babbitt*, 2020 WL 6153608, at *8 ("Several countries, including Hong Kong, Belgium, the Netherlands and the United States, have confirmed cases of re-infection. In some cases, the second infection was more serious than the first" (citing Andrew Joseph, *Scientists are reporting several cases of Covid-19 reinfection – but the implications are complicated*, State News (Aug. 28, 2020), https://www.statnews.com/2020/08/28/covid-19-reinfection-implications/; Brenda Goodman, MA, *Dutch Woman First to Die After COVID-19 Reinfection*, WebMD (Oct. 14, 2020), https://www.webmd.com/lung/news/20201014/dutch-woman-first-to-die-after-covid-19-infection). The Court is encouraged to learn of the positive steps the BOP has taken to curb the spread of COVID-19 in its facilities and to treat those who fall ill. Gov't's Opp'n, ECF No. 182 at 6-9. But the fact remains that as of the writing of this Opinion, 702 inmates and 75 staff at FCI Oxford have had the virus. *COVID-19 Cases*, BOP (last visited Feb. 15, 2021), https://www.bop.gov/coronavirus/. That means there have been 110 new inmate cases and 31 new staff cases since Mr. Muhammad filed his motion on November 11, 2020. *See* Def.'s Mot., ECF No. 180 at 8-9.

Accordingly, in view of the severity of risk Mr. Muhammad faces if he contracts COVID-19 again due to his obesity and history of smoking, combined with the lack of assurance that his prior COVID-19 diagnosis immunizes him from reinfection and the

18

continued risk of COVID-19 spread at FCI Oxford, the Court
concludes that extraordinary and compelling reasons warrant a
reduction in his sentence.

### C. Mr. Muhammad Does Not Present A Danger To His Community

Having found that Mr. Muhammad satisfies his burden of
demonstrating extraordinary and compelling reasons, and assuming
without deciding that the Sentencing Commission's policy
statement binds the Court, the Court must determine whether Mr.
Muhammad is "a danger to the safety of any other person or to
the community." U.S.S.G. § 1B1.13(2). In determining whether Mr.
Muhammad is a danger to the community, the Court considers the
18 U.S.C. § 3142(g) factors including: (1) "the nature and
circumstances of the offense charged"; (2) "the weight of the
evidence"; (3) "the history and characteristics" of the
defendant; and (4) "the nature and seriousness of the danger to
any person or the community that would be posed by the
[defendant's] release." 18 U.S.C. § 3142(g); U.S.S.G. §
1B1.13(2).

As to the nature and circumstances of the offense charged,
Mr. Muhammad's incarceration stems from his participation in a
criminal conspiracy to possess and distribute large quantities
of drugs. Indictment in *United States v. Muhammad*, CR 12-254,
ECF No. 1. Mr. Muhammad pled guilty to one count of conspiracy
to distribute and possess with intent to distribute 280 grams or

more of cocaine base, 100 grams or more of heroin, and
marijuana. Plea Agreement in *United States v. Muhammad*, CR 12-
254, ECF No. 243 at 1. Prior to this conviction, Mr. Muhammad
was convicted in 2013 under the Bail Reform Act, in 2009 for
Possession With Intent to Distribute Cocaine Base, in 2008 for
Possession of Cocaine and Heroin, and in 2007 for Possession of
a controlled substance. Gov't's Opp'n, ECF No. 182 at 15-16
(citing ECF No. 182-1 and Def.'s Mot., ECF No. 180 at 3). The
government argues that Mr. Muhammad's "prior record and the
Defendant Muhammad's criminal conduct in the instant case
demonstrate that he has had very little or no regard for the law
prior to being incarcerated in the instant matter, and that he
represents a danger to the community from an ongoing or long-
term willingness to engage in illegal drug activity." *Id.* at 16
(citing cases). The government also contends that "his conduct
in the instant case suggests that prior to his arrest, he was
escalating his criminal conduct related to the sale of illicit
narcotics," and "he was a redistributor of large quantities of
illicit narcotics in Washington, D.C." *Id.* Moreover, the
government argues, Mr. Muhammad "was on supervised release or
probation at the time of the instant offense, and it appears
that none of these prior attempts at supervision or counseling
ultimately deterred him from engaging in the same, or very
nearly the same, criminal conduct in the instant case as he

previously did on prior occasions." *Id.* Mr. Muhammad, for his part, admits that his "offense was a serious one," but he contends that it "did not involve any violence." Def.'s Mot., ECF No. 180 at 22. The Court agrees. To be sure, Mr. Muhammad's violations are troubling, and his more senior role in the drug conspiracy that led to his conviction is particularly concerning, but his violations are not crimes of violence and did not involve weapons. *See Warren*, No. CR 10-202 (EGS), ECF No. 66 at 16. Mr. Muhammad's offenses are also more than eight years old.

As to the history and characteristics of the defendant, the government points out, and Mr. Muhammad admits, that he has incurred several infractions while incarcerated. *See* Gov't's Opp'n, ECF No. 182 at 17; Def.'s Mot., ECF No. 180 at 23-24. The government contends that "six of those eight incidents involved his possession of a dangerous weapon or hazardous tool." Gov't's Opp'n, ECF No. 182 at 17. Mr. Muhammad responds by describing his disciplinary record as "minimal" and "involv[ing] no acts of violence." Def.'s Reply, ECF No. 184 at 14. A review of the record confirms that Mr. Muhammad has one infraction for possession of a "sharpened wooden piece" and "metal piece found in his mattress," and other infractions for "possession of a hazardous tool" (including a cell phone in one instance and a cell phone charger in another instance) and "possession of

stolen property" ("onions, peppers, spices, noodles"). Inmate
Disciplinary Data, ECF No. 180-2 at 6-8. The Court agrees with
the government that Mr. Muhammad's disciplinary record,
specifically the infraction for possession of a hazardous
weapon, weighs against his request for immediate release.
However, Mr. Muhammad presents compelling arguments regarding
his rehabilitation that outweigh the concerns raised by his
disciplinary record. During his incarceration, Mr. Muhammad has
completed over 30 education classes. *See* Def.'s Mot., ECF No.
180 at 23. In addition, according to Mr. Muhammad's sister—
Ihsan Muhammad, Director of Strategic Partnerships for the
Community Education Building in Wilmington, Delaware—Mr.
Muhammad is planning to start a non-profit organization upon his
release from prison to "inform young people on how to make
better choices, even in difficult circumstances," ECF No. 184-1
at 2. Ms. Muhammad attests that her brother "is not only
reformed, but is committed to using his life to keep other young
men and women from making choices that could land them in prison
or worse." *Id.* Ms. Muhammad also describes Mr. Muhammad as an
excellent father to his daughter. *Id.* The Court credits Ms.
Muhammad's letter of support.

The Court also credits Mr. Muhammad's family connections
and ties to the Washington D.C. area. Mr. Muhammad states that
if he is released, he will live with his mother. Def.'s Mot.,

ECF No. 180 at 22. His mother "will be there to monitor his symptoms at every moment of the day" and will "provide him with needed medical care in the most effective manner possible." *Id*. Mr. Muhammad's sister is also "prepared to assist" Mr. Muhammad "in any way [she] can." ECF No. 184-1 at 2.

On balance, and for the reasons discussed above, the Court finds that Mr. Muhammad is not a danger to his community. *Cf. Morris*, 2020 WL 2735651, at *2, *7 (finding defendant, who was convicted of bank robbery after threatening to detonate a bomb, to not present a danger to his community).

### D. The Section 3553(a) Factors Support A Reduction In Sentence

Because the Court has found that Mr. Muhammad has provided extraordinary and compelling reasons for a reduction and that he would not pose a danger to the community if he were to receive a reduction, the Court must now reevaluate his sentence under the applicable Section 3553(a) factors. *See Morris*, 2020 WL 2735651, at *2 (citing 18 U.S.C. § 3582(c)).

Mr. Muhammad has served over 70% of his sentence, and he is currently set to be released from prison in a little over two years. *See* Def.'s Mot., ECF No. 180 at 22; Summ. Reentry Plan Progress Report, ECF No. 180-2 at 2. Mr. Muhammad contends that "in the midst of a worldwide pandemic, 9[2] months of actual custody is a just punishment." Def.'s Mot., ECF No. 180 at 22.

23

The "benefits of keeping [Mr. Muhammad] in prison for the remainder of his sentence," he argues, "are minimal," but "the potential consequences of doing so are extraordinarily grave." *Id.* at 23 (citing *United States v. Perez*, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020)). The government, on the other hand, contends that Mr. Muhammad's serious narcotics-related offenses, his criminal acts during prior periods of supervision, and his several infractions while incarcerated outweigh his COVID-19-related health concerns, and he has not demonstrated that the Section 3553(a) factors weigh in favor of a sentence reduction. Gov't's Opp'n, ECF No. 182 at 16-17.

The Court finds that consideration of the applicable Section 3553(a) factors supports reducing Mr. Muhammad's sentence. As stated above, the "nature and circumstances" of Mr. Muhammad's offenses are troubling. *See* 18 U.S.C. § 3553(a)(1). Aspects of Mr. Muhammad's "history and characteristics," specifically his infractions during incarceration, also raise some concerns. *Id.* However, Mr. Muhammad has not been convicted of any violent offenses, and the Court weighs heavily Mr. Muhammad's family ties in the area, Def.'s Mot., ECF No. 180 at 22; as well as his sister's endorsement of his release in light of her view that "he is not only reformed, but is committed to using his life to keep other young men and women from making choices that could land them in the prison or worse," and his

commitment to being a good father, ECF No. 184-1 at 2-3. Furthermore, in examining Section 3553(a)(2)(A)—"the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"—the Court acknowledges that the sentence imposed did not take into account the current pandemic or the effect it would have on individuals with Mr. Muhammad's medical conditions. *See Johnson*, 464 F. Supp. 3d at 42. And Mr. Muhammad has already served over 70% of his sentence, having been incarcerated now for over seven and a half years.

Thus, upon consideration of the factors set forth in 18 U.S.C. § 3553(a), the Court will exercise its discretion under the First Step Act to impose a reduced sentence of "time-served," which is sufficient and not longer than necessary to achieve the goals of sentencing.

**IV. Conclusion**

For the reasons stated above, Mr. Muhammad's Emergency Motion for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i), ECF No. 180, is **GRANTED**.[3]

**Accordingly, it is hereby**

---

[3] The Court declines to impose "a 14-day quarantine period and medical clearance" prerequisite for Mr. Muhammad's release as the government has requested. *See* Gov't's Opp'n, ECF No. 182 at 18 n.6.

**ORDERED** that the defendant is **RESENTENCED** with the original sentence of 130 months of imprisonment reduced to **TIME SERVED;** and it is further

**ORDERED** that, as a condition of supervised release, the defendant must contact the Probation Office by telephone within 72 hours of his release; and it is further

**ORDERED** that all other provisions of the sentence imposed on July 22, 2015, remain in effect.

**SO ORDERED.**

Signed: _____/s/_____
**Emmet G. Sullivan**
**United States District Judge**
**February 15, 2021**